**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jun 19 2013, 7:10 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**BRYAN LEE CIYOU**
**JESSICA K. KEYES**
**CASSANDRA MELLADY**
Ciyou & Dixon, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**DEBORAH M. AGARD**
Law Office of Deborah M. Agard
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN RE: THE MARRIAGE OF:           )
                                  )
BERNARD LEE, JR.,                 )
                                  )
    Appellant-Respondent,         )
                                  )
        vs.                   )    No. 30A01-1208-DR-380
                                  )
JACKIE SMITH,                     )
                                  )
    Appellee-Petitioner.          )

APPEAL FROM THE HANCOCK SUPERIOR COURT
The Honorable Terry K. Snow, Judge
The Honorable R. Scott Sirk, Commissioner
Cause No. 30D01-1101-DR-149

**June 19, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Bernard Lee ("Father") appeals the trial court's custody determination and division of property in the dissolution of his marriage to Jackie Smith ("Mother"). Father raises two issues, which we revise and restate as:

I.      Whether the court erred in determining physical custody of the parties' minor child; and

II.     Whether the court erred in its division of certain marital property.

We affirm in part, reverse in part, and remand.

FACTS AND PROCEDURAL HISTORY

Mother and Father were married on June 24, 2007, and in December 2007, a child, K.L., was born to the marriage. The parents built a marital residence in Fortville, Indiana, which was completed in 2009. On January 26, 2011, Mother filed for dissolution of her marriage to Father, and soon after she was awarded temporary possession of the marital residence as well as temporary physical custody of K.L. On May 4, 2011, Father filed a Motion for Appointment of Guardian Ad Litem for Purposes of Custody Evaluation, and on May 17, 2011 the court appointed Bonnie Wooten as Guardian Ad Litem (the "GAL"). On July 19, 2011, the GAL filed her report to the court.

On September 27 and October 18, 2011, the court held a final hearing at which the parties filed at the outset their verified financial declarations which noted that Father's weekly gross income was $2,039.44 and Mother's weekly gross income was $3,370.00, as well as the Parties' Agreement Regarding Final Issues (the "Agreement") which was approved by the court. The Agreement settled many issues related to K.L., noting

specifically that Mother and Father would share joint legal custody, as well as most other child-related issues with the exception of physical custody, divided many items of personal property between Mother and Father, and discussed other miscellaneous issues. Mother then called the GAL to testify regarding her report.

Mother's counsel began by questioning the GAL regarding Father's conviction in 1999 of criminal recklessness with a vehicle as a class A misdemeanor, and the GAL testified that the conviction involved Father attempting to run a vehicle off the road so that Father's wife at that time could have custody of her son instead of another woman, the driver of the vehicle, and that the four-year-old child was also in the woman's vehicle. The GAL also testified that she asked Father during his interview whether he had a criminal history, Father indicated that he did not, and when she subsequently discovered the conviction it was concerning because it "appeared to be [] something that one might have done in anger" and it involved a child. Transcript at 10.[1] Regarding the parties' parenting styles, the GAL testified that she believes they are different and that Mother speaks to K.L. about "rules and responsibilities" and "explains to her even at her young age [] what she expects and [] what her behaviors should be in any certain [] setting," while Father is "laid back and . . . a little more flexible." Id. at 15. The GAL testified that the parties' methods of discipline were also different, noting that Mother

---

[1] The record contains two transcripts which are not defined by separate volume numbers – one from the dissolution hearing held on September 27 and October 18, 2011, and a second transcript from a short hearing held on July 12, 2012. Citations to the "Transcript" refer to the transcript of the dissolution hearing.

3

"allows the child to [] make her rules and that [Father] would believe more in spanking the child if necessary." Id.

The GAL testified that the marital residence "was very clean and appropriate." Id. She testified that she was not able to examine Father's living situation because he was living with his brother in Evansville which would involve many hours of travel and Father "assured" her that it was temporary and he "would either be moving back to this area and/or he would be . . . moving into the marital residence . . . ." Id. at 16. She recommended that Mother be given physical custody of K.L. because it was "obvious" from email messages between the parents that they "can't communicate to each other" and "joint custody takes very special people who are very willing to work with one another . . . ." Id. at 21. She recommended that Mother have physical custody because it appeared that "she was really the one with the more structured environment at this time." Id. at 22. The GAL also recommended that Father be awarded parenting time for "no less than the parenting time guidelines" and that Father be permitted phone contact once per day. Id. at 25.

Mother testified that she was concerned with Father's "anger issues" which "had gotten worse over the past year" and included "throwing things in front of [K.L.], the way he talks to [K.L.] sometimes . . . ." Id. at 39. Mother testified that around the filing of the divorce, K.L. would throw things and hit and bite children at daycare but that these behaviors had subsided. Mother also testified that she believed these behaviors by K.L. were the result of her witnessing Father throwing things.

4

Mother testified that her and Father's parenting styles were different and noted that although she had spanked K.L. in the past, she has used other methods in the last several months, and that Father has spanked K.L. in instances in which Mother believed it was not necessary or appropriate. Mother testified that when she and Father began talking about divorce, Father informed her that if he had physical custody of K.L. "he would let her go to sleep whenever she wants" and "eat whatever she wanted" which was different from Mother's more structured parenting style. Id. at 50. Mother also noted that she thought although Father "wants to spend time" with K.L., he did not "want to make the effort to [] teach her how to be a good person and to behave appropriately." Id. at 39.

Mother testified regarding a specific incident in December 2010 or January 2011 in which the parents were attempting to place K.L. in her car seat and when K.L. resisted, Father "gave her a choice of either getting in the car seat or getting on the floor and when she wouldn't get into the car seat, he was physically pulling on her shirt and pulling her onto the floor." Id. at 40. Mother testified that she then took K.L. out of the car and walked her around for about ten minutes to calm her down, and that while she was doing this, Father "took everything out of the backseat and threw it into the front seat" because he was mad. Id. at 41. Mother also testified that Father frequently yelled at K.L. in a way which she believed was inappropriate.

Mother acknowledged that, during the marriage, Father most days would be with K.L. during the morning, prepare her for daycare, and drive her to daycare. Mother also

5

testified that Father would, on "[s]everal" occasions, feed K.L. foods like ice cream, soda, or chips for breakfast, which Mother thought was inappropriate, but Mother did not ever "take over the duties of getting [K.L.] up in the morning and getting her dressed and getting her fed because" she disagreed with Father's food choices. Id. at 107. Mother stated that it was her opinion Father did not think it was important to maintain a clean house and noted that it was "generally" her responsibility to make sure the house was clean. Id. at 115. Mother testified that often she would come home from work and K.L.'s breakfast dishes would still be on the table, and on one occasion K.L. had an accident in her underwear and when Mother came home K.L.'s dirty underwear "were still in the shower cause [Father] didn't have time to clean things up." Id. at 116.

Mother also testified that since Father moved out of the marital residence he had been exercising parenting time pursuant to the Indiana Parenting Guidelines and specifically that he would have K.L. every other weekend and on certain holidays, and that he would see her at lunch once in a while when he was in town. Mother also testified that Father did not exercise his midweek visitation time nor any of his four weeks of extended parenting time that he is entitled to under the guidelines.

Regarding property division, Mother testified that she believed the marital residence had approximately $20,000 of equity. She stated that she believed she should receive the equity because she sold her previous home and applied the $73,000 she received from the sale and "paid off the land that was part of the marital residence" consisting of over thirteen acres of farm land and a wooded area. Id. at 69. Mother also

6

testified that she made a down payment of approximately $20,000 to commence the construction of the house, and that Father paid half of the monthly home payments as well as $15,000 toward the purchase of the land when he sold some property.

Father requested that the court award the parties joint physical custody with K.L. spending alternating weeks with each parent, and stating that he intended to relocate to the Hancock County area even if he was not awarded the marital residence. Father testified that during the marriage, on most mornings he would feed K.L. cereal, yogurt, or a pop tart, as well as milk or orange juice depending on what was available, and that, although there was an occasion in which K.L. knew ice cream was in the home and ate ice cream and potato chips for breakfast, it was not the norm. Father testified that since the parties separated he would bring K.L. back to Mother on Sunday, and he would then stay at a hotel and go to lunch with K.L. on Mondays and Tuesdays. Father indicated that during those lunches he would sometimes eat at daycare with her but other times they would eat together at Dairy Queen, Arby's, or McDonald's. Father indicated that he felt it was appropriate to "spank" or "smack" K.L. if she did not obey her parents, that he would use his hand and "[u]sually" it was not of a repeated nature, and that he will "count to two or to three" before resorting to spanking. Id. at 164. Father noted that his use of spanking was one point of disagreement between he and Mother about parenting styles. Father also testified that during the marriage he would take K.L. to church on Wednesdays and Sundays, that it was a big part of K.L.'s upbringing in that K.L. learned

7

about "rights and wrongs" from the church's Bible teachings, and that he continued to take K.L. to church during his parenting time.

When asked about his failure to exercise midweek visitation and extended parenting time during the summer, Father indicated that he had misread the Indiana Parenting Time Guidelines and only learned of his right to such parenting time on the first day of the dissolution hearing, September 27, 2011. Father also admitted on cross-examination on the second day of the hearing in October that in the ensuing weeks he did not ask for midweek visitation time except for directly following the hearing. Also, regarding his failure to disclose his misdemeanor arrest in 1999, Father indicated that he mistakenly believed that the Guardian Ad Litem asked only if he had been convicted of a felony. Father also stated that he believed that he had matured since that time, that he did not handle his anger in the same way, and that he tries "to take a deep breath and step back . . . ." Id. at 189.

Father testified that he was asking for the marital residence because he "did a lot of research prior to the marriage and during the marriage" regarding "green features" which the home employs. Id. at 168. He stated that, if awarded the home, he believed that the equity should be shared 50/50 between the parties. Father testified that he sold property and applied the proceeds towards the home, but he also testified that Mother's contribution was greater than his. He stated that during the marriage the parties shared in the mortgage and utility payments equally, and that he agreed to share in the 2010 property tax payments as well. Father also requested various items on the property

8

including the wind turbine, solar panels, and cell phone/WiFi booster, as well as the John Deere lawn mower and Mule, canopy top, and plow.

Following the hearing, the court issued its Order on Findings of Facts Regarding Final Contested Issues (the "October 18, 2011 Order") in which it incorporated the Agreement and "decide[d]" the contested issues.[2] Appellant's Appendix at 18.[3] The Order stated, among other things, that Mother shall have primary physical custody of K.L., that Father shall have parenting time pursuant to the Indiana Parenting Time Guidelines, that Mother shall have sole possession and ownership of the marital residence, as well as the John Deere lawn mower, mule, canopy topper, and plow, and that Father shall have ownership of the wind turbine, solar panels, and cell phone/WiFi booster including the coax cable and antenna. In addition, the order specifically stated the following:

---

[2] We observe that, despite the court's use of the term "FINDINGS OF FACTS" in the title of the October 18, 2011 Order, the order does not contain findings pursuant to Ind. Trial Rule 52(A) and instead merely recites the court's decisions on how the contested issues were to be settled. For instance, Paragraph 1 of the October 18, 2011 Order states: "[Mother] shall have primary physical custody of [K.L.], born December 4, 2007." Appellant's Appendix at 18. There are not findings present in the order explaining the reasoning the court applied as to why primary physical custody was awarded to Mother or its reasoning regarding property division.

[3] We note that, as is more thoroughly explained below, due to multiple notices of appeal being filed by Father, multiple appeals were ultimately ordered consolidated by this court on November 14, 2012. **(Docket)** Consequently, Father has also filed two different versions of his appellant's appendix. One was filed on March 20, 2012, while a second version was filed on December 21, 2012, the same date as his appellant's brief. The December 21, 2012 version appears to contain all of the materials contained in the March 20, 2012 version plus various other documents which were subsequently generated. Accordingly, where we refer to the "Appellant's Appendix," we are referring to the version filed on December 21, 2012.

8. [Mother] shall receive 50% of the equity in the marital residence and said amount shall be payable by [her] to [Father] within 180 days of the entry of this Divorce Decree.

\* \* \* \* \*

15. [Mother] shall be entitled to claim the passive losses on the marital property related to the marital residence on her tax return.

16. . . . . Parties shall have a 50% share of crop rental for 2011 and [Mother] shall solely or 100% receive all crop rental in all future years.

\* \* \* \* \*

19. [Mother] is entitled to claim 100% of the mortgage interest deduction for the tax year of 2011 on the marital residence.

Id. at 21-22.

On November 10, 2011, Father filed a notice of appeal from the court's October 18, 2011 order under Cause No. 30A05-1111-DR-579 ("Cause No. 579"), and on November 16, 2011, notice of completion of the clerk's record was transmitted to this court. On November 17, 2011, Mother filed a motion to correct error stating that the court in its October 18, 2011 Order failed to dissolve the parties' marriage and requested that the court do so. Mother's motion also requested that the court determine the amount of equity in the marital residence and further requested that she be awarded fifty percent of the value of the wind turbine and solar panels which had been awarded to Father in the October 18, 2011 Order. On November 29, 2011, the court entered an order on Mother's motion to correct error stating that the marriage between Mother and Father is dissolved and establishing the equity in the marital residence to be $19,174.00.

10

On December 16, 2011, the court reporter filed a notice of filing of transcript on Father's appeal. On December 22, 2011, Father filed in this court a Motion for Remand to Trial Court on Motion to Correct Errors, Order thereon; Motion to Hold in Abeyance upon Remand Pending Entry of Orders by Trial Court; and Motion to Consolidate all Pending Matters into Instant Appeal, as well as another notice of appeal from the court's order on Mother's motion to correct error under Cause No. 30A05-1112-DR-670 ("Cause No. 670"), noting that "[t]his Notice of Appeal is being filed in conjunction with a Motion to Remand to Trial Court to properly enter an Order on [Mother's] Motion to Correct Error as jurisdiction had already transferred to the Court of Appeals before the Order on the Motion to Correct Error was entered" and requested that all the issues be consolidated. Id. at 80-81. On December 30, 2011, this court issued an order granting Father's motion and remanding to the trial court for a ruling on the motion to correct error. The order also stated that it was holding the matter in abeyance "until such time as the trial court proceedings . . . have concluded," noting that this court was retaining jurisdiction in order to determine the merits, "including any appealable issues raied [sic] in the trial court based upon this remand," and directed Father's counsel to file a status report by January 30, 2012. Cause No. 579 Docket. On January 5, 2012, following remand, the court entered a new ruling denying Mother's motion to correct error.

Father's counsel filed a status report on January 30, 2012, and on February 3, 2012 this court issued an order stating that it was resuming jurisdiction and ordering Father to file a brief within thirty days. Then, on February 6, 2012, this court issued an order

11

directing transfer of all filings in Cause No. 670 to Cause No. 579 and closing the docket on Cause No. 670, and that same day Father filed an amended notice of appeal in that matter listing both the October 18, 2011 order and the denial of the motion to correct errors on January 5, 2012 as the appealed judgments. Following Father's filing of his appellant's brief, on April 9, 2012, Mother filed a motion to dismiss in this court, and on May 21, 2012 this court issued an order dismissing the appeal without prejudice.

On June 11, 2012, Mother filed her Motion for the Entry of Final Judgment and Decree for Dissolution of Marriage in the trial court again requesting that the court dissolve the marriage of the parties and raising issues related to the division of property. Mother noted that the court ordered on October 18, 2011, that she receive fifty percent of the equity in the marital residence and that the other fifty percent shall be paid by Mother to Father within 180 days but that the court did not designate the amount of equity in the marital residence. Mother's motion highlighted that her financial declaration form indicated that there was $19,174.00 of equity in the marital residence, and Father's financial declaration form indicated that there was negative $3,000, or no equity, in the residence. Mother's motion also noted that she "paid $93,033.00 more than [Father] towards the purchase of the marital residence," that Father paid approximately $15,000 more towards the purchase of the acreage, and that therefore, Mother "contributed $78,000.00 more than [Father] . . . and 100% of these funds were accumulated by [her] prior to the parties cohabitating and prior to their marriage." Id. at 88. Mother's motion also stated Father was awarded the wind turbine and solar panels but she was not

12

compensated for her financial contribution towards their purchase, that the evidence revealed that Mother and Father each paid fifty percent of their cost, and that her financial declaration form listed their value at $30,000 and Father's form did not indicate a value. She concluded:

> [Mother] respectfully requests the Court find that there is no equity in the marital residence for the following reasons: [she] contributed significantly more funds towards the purchase of the marital residence, and $93,033.00 of those funds were acquired prior to the parties cohabitating and prior to their marriage; [she] received no remuneration for her financial contribution to the purchase of the wind turbine and solar panels [Father] was awarded; and [Father] on his own *Financial Declaration Form* indicated there was no equity in the marital residence.

Id. at 89. Mother also requested that the court issue an Entry of Final Judgment and Decree for Dissolution of Marriage pursuant to Ind. Trial Rule 54.

On June 14, 2012, Father filed his Motion to Strike Mother's Motion for Entry of Final Judgment and Decree for Dissolution of Marriage stating that Mother's motion "contains an attempt to get the Court to change its ruling, on a *nunc pro tunc* basis, which is impermissible by law," that "[t]he Court made its ruling on the evidence" and Mother "had a certain time period in which to file a Motion to Correct Error, and did not," and that "the proper procedure for the Court would be to issue a *Nunc Pro Tunc* Entry simply dissolving the marriage . . . ." Id. at 92. On July 12, 2012, the court held a hearing on the parties' motions and took the matter under advisement. On July 26, 2012, the court entered a *Nunc Pro Tunc* Entry of October 18, 2011, stating that "the Court now enters the following *Nunc Pro Tunc* Entry: 'The marriage of the parties is now dissolved.' That

13

said Entry is made *nunc pro tunc* for the Order on Findings of Fact Regarding Final Contested Issues dated October 18, 2011." Id. at 13.

That same day, the court also entered its Entry of Final Judgment and Decree for Dissolution of Marriage (the "Final Judgment") containing the following findings, among others:

7. In the [October 18, 2011 Order], the Court ordered that "[Mother] shall receive 50% of the equity in the marital residence and said amount shall be payable by [her] to [Father] within 180 days . . . ."

8. The [October 18, 2011 Order] did not designate the amount of equity, if any, in the marital residence.

9. There was evidence presented, and the Court now finds that [Mother] estimated the equity in the marital residence to be $19,174.00, and [Father] estimated that there was a negative equity of $3,000.00 in the marital residence.

10. There was evidence presented, and the Court now finds that [Mother] paid $19,264.00 more than [Father] for the down payment on the marital residence with funds she saved prior to the parties cohabitating and prior to their marriage.

11. There was evidence presented, and the Court now finds that [Mother] paid $73,769.00 more than [Father] in a lump sum towards the purchase of the marital residence with funds from the sale of a residence she owned prior to the parties cohabitating and prior to their marriage.

12. There was evidence presented, and the Court now finds that [Father] paid approximately $15,000.00 more towards the purchase of the acreage than [Mother] when he sold property he owned prior to the parties cohabitating and prior to their marriage.

13. There was evidence presented, and the Court now finds that [Mother] contributed $78,000.00 more than [Father] towards the purchase of the marital residence and acreage, and 100% of that

amount was accumulated by [her] prior to the parties cohabitating and prior to their marriage.

14. As of the date of the filing of [Mother's] *Verified Petition for Dissolution of Marriage*, the parties owned a wind turbine and solar panels which were located on the premises . . . . [which] were awarded to [Father] . . . . There was no order that [Father] should pay [Mother] any of the value of the wind turbine and solar panels.

15. There was evidence presented, and the Court now finds the value of the wind turbine and solar panels to be $30,000.00.

16. There was evidence presented, and the Court now finds that the parties each paid 50% of the cost of the wind turbine and solar panels.

   The Court, having made such findings, concludes that a Decree of Dissolution should be, and hereby is granted, and a Final Judgment, pursuant to Indiana Trial Rule 54, should be, and hereby is entered on the issues of the equity of the marital residence, and therefore

**THE COURT NOW ORDERS, ADJUDGES, AND DECREES:**

1. The marriage between the parties is hereby dissolved and the parties are returned to the status of unmarried persons.

2. There is no equity in the marital residence for the following reasons: [Mother] contributed significantly more funds towards the purchase of the marital residence, with funds she acquired prior to the parties cohabitating and prior to their marriage; [Mother] received no remuneration for her financial contribution to the purchase of the wind turbine and solar panels [Father] was awarded; and [Father] on his own *Financial Declaration Form* indicated there was no equity in the marital residence.

3. The [October 18, 2011 Order], which incorporates and approves the [Agreement] ordered and approved on September 27, 2011, is incorporated into this [Final Judgment].

Id. at 15-17.

15

On August 27, 2012, Father timely appealed from the court's Final Judgment, *Nunc Pro Tunc* Entry, and October 18, 2011 Order under Cause No. 30A01-1208-DR-380 ("Cause No. 380"). On November 14, 2012, pursuant to Father's request this court ordered that the record from Cause No. 579 be transferred and consolidated with Cause No. 380.

STANDARD OF REVIEW

To the extent the court entered findings, we observe that generally, *sua sponte* findings control only as to the issues they cover, and a general judgment will control as to the issues upon which there are no findings. Yanoff v. Muncy, 688 N.E.2d 1259, 1262 (Ind. 1997). When a trial court has made findings of fact, we apply the following two-tier standard of review: whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions thereon. Id. Findings will be set aside if they are clearly erroneous. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Id. A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. Id. To determine that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made. Id. "A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence." Id.

DISCUSSION

I.

16

The first issue is whether the court erred in determining physical custody of K.L. A trial court's custody determination is afforded considerable deference as it is the trial court that sees the parties, observes their conduct and demeanor, and hears their testimony. Kondamuri v. Kondamuri, 852 N.E.2d 939, 945-946 (Ind. Ct. App. 2006). Thus, on review, we will not reweigh the evidence, judge the credibility of witnesses or substitute our judgment for that of the trial court. Id. at 946. We will reverse the trial court's custody determination only if it is clearly against the logic and effect of the facts and circumstances or the reasonable inferences drawn therefrom. Id.

The standard for an initial custody determination is set forth in Ind. Code § 31-17-2-8, which reads in pertinent part as follows:

The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there is no presumption favoring either parent. The court shall consider all relevant factors, including the following:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

17

(5) The child's adjustment to the child's:

    (A)    home;

    (B)    school; and

    (C)    community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent. . . .

Father argues that "neither the GAL nor the trial court found these factors determinative to the physical custody of K.L., but instead only examined or focused on parenting styles as determinative." Appellant's Brief at 13-14. Father contends that "[t]his Court should reverse with instructions to order joint physical custody in the parties or sole physical custody to [him], making necessary adjustments to child support and related matters." Id. at 25.

Regarding the age and sex of K.L., Father asserts that it does not appear that the court considered this factor and indeed due to K.L.'s young age this factor should have a *de minimus* impact. Father reiterates in discussing the second factor that while he was asking for joint physical custody, Mother wanted sole physical custody. With respect to the third factor, Father notes that the GAL's report highlighted that K.L. "loves and is very comfortable with **both** of her parents." Id. at 15 (quoting Appellant's Appendix at 30). Father argues that the fourth factor tilts physical custody in his favor and thus supports joint physical custody because the evidence presented revealed that Father

18

frequently visited his extended family, including his mother and brother, and that "[t]he only fact and inference this evidence raises is K.L. is more closely bonded with [his] family." Id. at 16. Father argues that if he were to have only parenting time under the guidelines, K.L.'s relationship with Father's family will be impaired. Father also contends regarding this factor that Mother's attempt to take issue with Father not exercising midweek parenting time during the pendency of the dissolution as demonstration that he did not want such parenting time was misplaced because it was "simply impossible" due to the seven-hour drive it would require. Id. at 17. Father argues that the fifth factor regarding adjustment to home, school, and the community was neutral as to custody because it had been agreed that K.L. would remain at the same daycare which, given her young age, was her only involvement in the larger community, and notes that Indiana case law makes clear that with very young children, "short of some specific evidentiary showing, this is at most a theoretical concern." Id. at 18 (citing Baxendale v. Raich, 878 N.E.2d 1252 (Ind. 2008)). Father also notes that both parents planned on remaining in the same proximity of the marital residence, although Mother indicated that if she was not awarded the house she would move to Hamilton County, that K.L. had not lived at the marital residence her entire life but a mere eighteen months, and that if anything K.L.'s involvement with Father's church might slant this factor in Father's favor. Father finally argues regarding the factors that "[t]he underlying record reflects no physical or mental health issues of either party, nor domestic or family violence . . . . Thus, these statutory factors are neutral to the trial court's custody finding

and award to Mother and are unsupported by the record to the extent they played any role" in the court's decision, while noting in a footnote that his 1999 misdemeanor arrest was immaterial and was "used to attempt to assassinate [his] general character" at the hearing.  Id. at 19, 19 n.1 (footnote omitted).[4]

---

[4] Father also appears to argue that he "would have to rebut the presumptive application" of the Indiana Parenting Time Guidelines and demonstrate that joint custody is in K.L.'s best interests under the law.  Appellant's Brief at 21.  We observe that the Parenting Time Guidelines, in the section governing their scope of application, state that they "are applicable to all child custody situations, including paternity cases and cases involving joint legal custody *where one person has primary physical custody*." (Emphasis added).  Also, the Guidelines' scope of application states that "[t]here is a presumption that the Indiana Parenting Time Guidelines are applicable in all cases.  Deviations from these Guidelines by either the parties or the court that result in parenting time less than the minimum time set forth below must be accompanied by a written explanation indicating why the deviation is necessary or appropriate in the case."  Thus, the applicable presumption relates to whether or not to *deviate* from the Parenting Time Guidelines where the Guidelines are applicable.

Here, Father challenges the court's custody determination awarding Mother physical custody, and he requests this court to reverse the trial court and remand for it to enter an order awarding joint physical custody or sole physical custody to him.  To the extent that the trial court applied the Parenting Time Guidelines, Father does *not* challenge the court's decision to award Father parenting time pursuant to the Guidelines with the exception, as recommended by the GAL, that Mother shall have K.L. every Memorial Day weekend and Father every Labor Day weekend beginning in 2012.  Thus, Father challenges the court's initial *custody* determination pursuant to Ind. Code § 31-17-2-8 which, as that section instructs, does not presume to favor either parent, and he does not challenge the court's imposition of parenting time pursuant to the Parenting Time Guidelines *following* its decision to award physical custody to Mother.  Accordingly, the Indiana Parenting Time Guidelines do not factor into our analysis.

Father also raises the argument that Ind. Code § 31-17-2-8 as well as the application of the Parenting Time Guidelines, as applied to him, violate his fundamental right to raise his family with minimal court interference and is therefore unconstitutional. **(Appellant's Brief at 25-26)**  Father argues that "[t]he only way to effectuate a constitutional balance in cases with these facts is to indeed order joint physical custody."  Id. at 26.  Father cites to G.B. v. Dearborn Cnty. Div. of Family and Children, 754 N.E.2d 1027, 1031 (Ind. Ct. App. 2001), trans. denied, which is a case addressing the termination of parental rights and reunification efforts.  To the extent that Father argues that his "fundamental right to raise his or her child without undue interference from the state," which, as G.B. notes, "is not unlimited because the state has a compelling interest in protecting the welfare of children," 754 N.E.2d at 1032, is impacted by the court's custody determination as part of a marriage dissolution proceeding, Father does not develop his argument.  Consequently, this argument is waived.  See Loomis v. Ameritech Corp., 764 N.E.2d 658, 668 (Ind. Ct. App. 2002) (holding argument waived for failure to cite authority or provide cogent argument), reh'g denied, trans. denied.

Mother begins by noting that the court entered a general judgment of K.L.'s custody and neither party requested specific findings, and she reiterates that general judgments will be affirmed if sustainable on any legal theory supported by the evidence. Mother argues that Father "asks this Court to reweigh the evidence while omitting critical facts about himself that negatively impacted the child's best interests." Appellee's Brief at 5. Mother contends that Father's assertion that neither the GAL nor the trial court adequately applied Ind. Code § 31-17-2-8 and instead focused on the difference in parenting styles as being determinative is not supported by the evidence, and she cites to various passages in the GAL's report and argues that the evidence presented was sufficient under the applicable standard of review. In her summary of the argument section, Mother specifically points to Father's previous criminal conviction, noting that he lied to the GAL about its existence, and that he "did not exercise parenting time alone with [K.L.] on a consistent basis during the pendency of the action, but rather, relied on extended family members to host and assist with his parenting time."[5] Id. at 3.

In his reply brief, Father urges that "this court should not affirm under a general judgment standard, as Mother based her argument on inaccurate and skewed 'facts' to form the basis of her conclusion; therefore, failing to state any evidence to support her conclusion." Appellant's Reply Brief at 3. Father argues that his misdemeanor

---

[5] Mother notes in her brief that the conviction occurred "just two years before this action," which is a misstatement as the conviction occurred in 1999. Appellee's Brief at 3. Father's reply brief contains a footnote stating that "Mother's Counsel spoke with Father's Counsel on March 6, 2013 and acknowledged her error in the date of his conviction for reckless driving; specifically stated it occurred 12 years prior and not recently or two years before the custody determination as stated in Mother's brief on pages 3 and 4." Appellant's Reply Brief at 3 n.1.

conviction, which occurred "several years before K.L. was even born and years before Father and Mother were married" was an isolated incident and should not support a determination of sole custody for the other parent, noting that Section 8 talks about "a pattern of violence" and also that the incident does not bear on his mental or physical health. Id. at 4. Father notes that the GAL even noted in her report that "'there is nothing inherently wrong with either parent' after having full knowledge and review of the incident." Id. Father also asserts that "Mother argues that custody was properly awarded because [he] did not have a home for the child" but that "this is wholly inaccurate" as he was asking for the marital residence and accordingly "did not want to invest in a long term solution for housing," and the GAL even noted that he "had concrete plans for future housing near K.L. if needed." Id. at 5. Finally, Father argues that Mother "is asking the Court to consider Father having a dependable loving extended family as a negative for K.L." where she argues that "Father failed to demonstrate that he could care for K.L. for extended periods of time . . . ." Id. at 6. Father argues that he presented "several specific ways in which he cared for K.L., including but not limited to, changing her, bathing her, preparing meals, taking her to school and the doctor, instilling moral values, and interacting with her teachers/daycare workers as necessary." Id. at 6-7.

After reviewing the arguments of the parties and the evidence presented, we cannot say that the court abused its discretion in rendering its judgment. As Father admits, the factors set forth in Ind. Code § 31-17-2-8 are not exhaustive, noting that the court "shall consider all relevant factors, including" the factors listed. At the hearing, the

22

GAL recommended that Mother be given physical custody of K.L. because it was "obvious" from emails she had read exchanged between the parents that they "can't communicate to each other" and "joint custody takes very special people who are very willing to work with one another," and also because it appeared that Mother "was really the one with the more structured environment at this time." Transcript at 21-22.

Also, in the GAL's report which was admitted into evidence, she indicated that, in addition to communication problems, the parties' parenting styles "differ greatly and thus cause problems with joint parenting." Appellant's Appendix at 34. The report notes that as K.L. has "began to assert her independence, the parties began to have more and more parenting difficulties" including "numerous disagreements on parenting styles, values and discipline." Id. at 32. The report stated that since K.L. "has become more assertive, [Mother] states that [Father] began to show signs of anger problems that disturb her greatly," noting specifically that Father would become frustrated with trying to put K.L. to bed and would begin to throw things, which is a behavior that K.L. began to copy. Id. Also, at the hearing, the GAL explained this difference in that Mother speaks to K.L. about "rules and responsibilities" and "explains to her even at her young age [] what she expects and [] what her behaviors should be in any certain [] setting," while Father is "laid back and . . . a little more flexible" and that in addition, their methods of discipline were different, noting that Mother "allows the child to [] make her rules and that [Father] would believe more in spanking the child if necessary." Transcript at 15. The GAL also indicated that she was concerned when she found out about Father's 1999 conviction of

23

criminal recklessness with a vehicle as a class A misdemeanor because it "appeared to be [] something that one might have done in anger" and it involved a child. Id. at 10.

Mother echoed these concerns at the hearing and specifically testified that Father would spank K.L. in instances in which Mother believed it was not necessary or appropriate. Mother testified that Father has indicated that if he had physical custody of K.L. "he would let her go to sleep whenever she wants" and "eat whatever she wanted" which was different from Mother's more structured parenting style. Id. at 50. Mother also testified that she believes that Father would make poor choices on what to feed K.L., noting that he has fed her foods like ice cream, soda, or chips for breakfast. Mother testified that Father frequently yells at K.L. in an inappropriate manner and spoke about a specific incident in which, while both Mother and Father were struggling to put K.L. in her car seat, Father "took everything out of the backseat and threw it into the front seat" because he was mad. Id. at 41. Finally, as noted by Mother the GAL observed in her report that Father did not have a residence to review and assess to determine his ability to maintain a safe, secure, and clean home. The court heard testimony by Mother that, in her opinion, Father did not think it was important to maintain a clean house and noted that it was "generally" her responsibility to make sure the house was clean. Id. at 115. Mother testified that often she would come home from work and K.L.'s breakfast dishes would still be on the table, and on one occasion K.L. had an accident in her underwear and when Mother came home her dirty underwear "were still in the shower cause [Father] didn't have time to clean things up." Id. at 116.

Based upon the evidence in the record, we cannot say that the court abused its discretion when it awarded primary physical custody to Mother and awarded Father parenting time pursuant to the Indiana Parenting Time Guidelines.

## II.

The next issue is whether the trial court erred in its division of certain marital property. Ind. Code § 31-15-7-4 governs the division of property in dissolution actions and requires that the trial court "divide the property in a just and reasonable manner." Ind. Code § 31-15-7-4(b). The court shall presume that an equal division of marital property between the parties is just and reasonable, and the trial court may deviate from an equal division only when that presumption is rebutted. Ind. Code § 31-15-7-5. The trial court's division of marital property is "highly fact sensitive and is subject to an abuse of discretion standard." Fobar v. Vonderahe, 771 N.E.2d 57, 59 (Ind. 2002). Also, a trial court's discretion in dividing marital property is to be reviewed by considering the division as a whole, not item by item. Id. We "will not weigh evidence, but will consider the evidence in a light most favorable to the judgment." Id. A trial court may deviate from an equal division so long as it sets forth a rational basis for its decision. Hacker v. Hacker, 659 N.E.2d 1104, 1109 (Ind. Ct. App. 1995).

The party challenging the trial court's division of property must overcome a strong presumption that the court complied with the relevant statute and considered evidence on each of the statutory factors. Gaskell v. Gaskell, 900 N.E.2d 13, 19 (Ind. Ct. App. 2009). This is one of the strongest presumptions applicable to our consideration on appeal. Id.

"Thus, we will reverse a property distribution only if there is no rational basis for the award." Helm v. Helm, 873 N.E.2d 83, 89 (Ind. Ct. App. 2007) (citation omitted).

It is well-established that all marital property goes into the marital pot for division, whether it was owned by either spouse before the marriage, acquired by either spouse after the marriage and before final separation of the parties, or acquired by their joint efforts. Ind. Code § 31-15-7-4(a); Beard v. Beard, 758 N.E.2d 1019, 1025 (Ind. Ct. App. 2001), trans. denied. This "one-pot" theory ensures that all assets are subject to the trial court's power to divide and award. Thompson v. Thompson, 811 N.E.2d 888, 914 (Ind. Ct. App. 2004), reh'g denied, trans. denied. The trial court has no authority to exclude or set aside marital property but must divide all property. Moore v. Moore, 695 N.E.2d 1004, 1010 (Ind. Ct. App. 1998). However, "[a]lthough the trial court must include all assets in the marital pot, it may decide to award an asset solely to one spouse as part of its just and reasonable property distribution." Gaskell, 900 N.E.2d at 19.

Ind. Code § 31-15-7-5 provides:

The court shall presume that an equal division of the marital property between the parties is just and reasonable. However, this presumption may be rebutted by a party who presents relevant evidence, including evidence concerning the following factors, that an equal division would not be just and reasonable:

    (1)    The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.

    (2)    The extent to which the property was acquired by each spouse:

        (A)    before the marriage; or

<blockquote>

(B)    through inheritance or gift.

(3)    The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.

(4)    The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5)    The earnings or earning ability of the parties as related to:

(A)    a final division of property; and

(B)    a final determination of the property rights of the parties.

</blockquote>

Father argues that, between the October 18, 2011 Order and the Final Judgment, the trial court made "***conflicting*** conclusions based upon the ***exact same evidence*** being presented creating a situation where, as a whole, the final Order's findings are not supported by the evidence." Appellant's Brief at 28. Father asserts that "[a]dditionally, by finding that there is no equity in the marital residence and thereby cutting [him] out of any financial portion of the residence, the Court created an unjust, unequal, and unreasonable distribution of the marital assets that deviates from the statutory presumption," noting that the court "did not recognize that this is a deviation from the statutory presumption, or state any reasons for deviating from the presumptive 50/50 split, as required." Id. at 28-29. Father also argues that "the court confuses the basic

27

understanding of what 'equity' is, versus, the factors necessary to rebut the presumption of an unequal division," noting that the court found that there was no equity in the home because Mother contributed funds from the sale of her prior home. Id. at 30. On this score, Father contends that "[e]quity is best determined by a property valuation, whereby the value of the property is compared against the debt owed," that Mother's "financial contribution is one factor that would constitute a proper ground for deviation from the unequal distribution of the marital asset (i.e. the equity in the home)," and that "equity, or lack thereof, is not determinative solely on the fact that one party contributed more to the initial purchase." Id.

Father also argues that Mother "comingled the funds from the sale of her previous residence with that of a marital asset," that both parties lived in Mother's previous home prior to and after their marriage, and thus the home "was marital property when it was sold . . . ." Id. at 30-31. Father asserts that he contributed "substantial research" towards the "green aspects" of the home which will save the owner on utility costs in the future, and also the court "failed to consider that [Father's] income is less than [Mother's], and thereby gave no consideration to the economic circumstances of each spouse." Id. at 31. Father also notes that the court's determination that there was no equity in the home was based in part on the fact that he was awarded the solar panels and wind turbine without remuneration to Mother, but the court failed to acknowledge that she "also received the John Deer [sic] Mower with plow, the passive loans [sic] from the losses on the residence, all future crop rentals and the mortgage deduction" which were all marital

28

property and should have been divided equitably. Id. Finally, Father points out that the court, in its initial order on Mother's motion to correct error which was later determined to be invalid due to lack of jurisdiction, concluded that the home contained $19,174 of equity, that the solar panels and wind turbine should not be subtracted from his portion of that equity, and that the court's subsequent Final Judgment was based upon the same evidence.

Mother argues that "[r]ecognizing that there were errors in the interlocutory orders issued, the trial court corrected those errors in the" Final Judgment, and the court retained jurisdiction to correct or modify its orders because a final judgment had not been entered and the case remained *in fieri*. Appellee's Brief at 9 (citing Rohrer v. Rohrer, 734 N.E.2d 1077, 1082 (Ind. Ct. App. 2000)). Mother cites to Kirkman v. Kirkman, 555 N.E.2d 1293, 1294 (Ind. 1990), for the proposition that courts "are not required to explain the reasons for an inconsequential deviation from an equal division of marital property." Id. at 10. Mother argues that "the trial court exercised its discretion and concluded that [she] rebutted the presumptively equal division of marital property based, in part, on her superior contributions to the marital residence" and it "is not required to enter findings on each statutory factor when dividing a marital estate." Id. at 14. Mother also argues that Father either waived his argument or invited any error in the court's determination that there was no equity in the marital residence because he "proffered no realtor, broker, or other expert testimony concerning the value of the marital residence, nor did he submit any appraisal," and the court's determination was within the range of the values

submitted by the parties, noting that Father "claimed a negative value of $3,000, while [she] claimed an equity of over $19,000." Id. at 16.

In his reply brief, Father contends that it is undisputed that trial courts are required to explain their reasoning when ordering unequal divisions of property and "[n]owhere in the instant case, did the court ever note this was an unequal division of property nor explain its deviation." Appellant's Reply Brief at 7. Father argues that here the court awarded an unequal division of property and, in so doing, failed to consider two of the statutory factors: "1) the economic circumstances of each spouse and 2) their earning abilities." Id. at 7-8. Father notes that to the extent Mother relies upon Kirkman, that case "is not applicable as the unequal division in this case was clearly *substantial*." Id. at 10. Father asks that we remand to the trial court and order that it consider all of the statutory factors in dividing the marital estate.

Especially in light of the circuitous procedural history involved, as well as the fact that the court essentially adopted the language contained in Mother's June 11, 2012 Motion for Entry of Final Judgment and for Dissolution of Marriage, we are persuaded that the court failed to consider all of the factors set forth by Ind. Code § 31-15-7-5 and that accordingly remand is appropriate. We observe that, as recited above, both parties accept that the property division ordered by the court deviated from an equal division. The court in its Final Judgment, relying in part on the fact that Mother "contributed significantly more funds towards the purchase of the marital residence, with funds she acquired prior to the parties cohabitating and prior to their marriage," Appellant's

Appendix at 17, concluded that the home contained no equity. Thus, in its Final Judgment the court decided to award the martial residence and whatever equity contained therein to Mother because of her financial contributions in its purchase, effectively applying Ind. Code § 31-15-7-5(1) in lieu of an equal distribution.

As noted in part above, the extent of the court's statements regarding property division in its initial October 18, 2011 Order were that Mother be awarded sole possession and ownership of the marital residence, that Mother receive fifty percent of the equity in the marital residence and pay the other fifty percent to Father, that Mother pay the debt on the marital residence, that Mother have ownership of the lawn mower, mule, canopy topper, and plow and Father have ownership of the wind turbine, solar panels, and cell phone/WiFi booster including the coax cable and antenna, and that Mother be entitled to passive losses on her tax return, the mortgage interest deduction, and the crop rentals in 2012 and beyond, as well as dividing up certain chairs and stools. Also, as we observed, the October 18, 2011 Order merely recited the court's ruling and did not set forth the reasoning behind such decisions. Not only did the court not indicate that it was deviating from a 50/50 split of marital assets in dividing the marital estate, but also it is unclear at best that the court intended to do so. Indeed, the court awarded each party fifty percent of the equity in the marital residence, ordered that the parties split the crop rentals in 2011, and divided up certain other assets including the lawn mower, mule, canopy topper and plow, wind turbine, solar panels, cell phone/WiFi booster, and the chairs and stools.

In its October 18, 2011 Order, the court awarded Father fifty percent of the equity in the marital residence but, following an additional hearing nearly nine months later, entered an order establishing that the marital residence did not contain any equity. In doing so, it adopted almost verbatim Paragraph 15 of Mother's June 11, 2012 motion, which warrants cautious appellate scrutiny. See Carpenter v. Carpenter, 891 N.E.2d 587, 593 (Ind. Ct. App. 2008) ("Although we do not apply an altered standard of review when a trial court adopts a party's findings verbatim, 'near verbatim reproductions may appropriately justify cautious appellate scrutiny.'") (quoting Stevens v. State, 770 N.E.2d 739, 762 (Ind. 2002), reh'g denied, cert. denied, 540 U.S. 830, 124 S. Ct. 69 (2003)). After reviewing the record, we cannot say for certain that the court considered evidence on each of the statutory factors provided by Ind. Code § 31-15-7-5, including consideration of the disparate earnings of Mother and Father in which Mother's weekly gross income was established to be $3,370.00 while Father's was $2,039.44, and did not provide a rational basis for deviating from an equal division of the parties' assets. Accordingly and under the circumstances, we conclude that remand is warranted for the court to consider all of the factors in Ind. Code § 31-15-7-5 and, if it indeed intends to deviate from an equal distribution, to explain its reasons for doing so.

## CONCLUSION

For the foregoing reasons, we affirm the court's custody determination for K.L., reverse the court's order regarding property division, and remand.

Affirmed in part, reversed in part, and remanded.

RILEY, J., and BRADFORD, J., concur.